UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
F I L E D
MAR - 2 2016
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA
```

| | |
|---|---|
| JACQUELINE WILLIAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:14-cv-01349 (AJT/IDD) |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## REPORT AND RECOMMENDATION

This matter is before the Court on the parties' cross-Motions for Summary Judgment. (Dkt. Nos. 17, 19.) Pursuant to 42 U.S.C. § 405(g), Jacqueline Williams ("Plaintiff" or "Ms. Williams"), on behalf of the minor claimant ("D.M.S." or "Claimant"), seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") denying her grand-niece's claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381–1383f. For the following reasons, the undersigned recommends that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.

## I.   PROCEDURAL BACKGROUND

On December 22, 2011, Plaintiff, maternal great-aunt and legal guardian to D.M.S., protectively filed an application for SSI benefits, alleging her grand-niece's disability since September 1, 2007 due to attention deficit hyperactivity disorder ("ADHD"), fetal alcohol syndrome ("FAS"), and attachment disorder. (Administrative Record ("R.") 10, 37.) Plaintiff's initial claim was denied on April 30, 2012 and again upon reconsideration on July 10, 2012. (*Id.*

at 58–62, 64–67.) Plaintiff then requested a hearing in front of an Administrative Law Judge ("ALJ") on July 15, 2012. (*Id.* at 68.)

On July 18, 2013, ALJ Eugene Bond conducted a hearing at which Plaintiff and D.M.S. testified. (*Id.* at 25–26.) At the hearing, Plaintiff amended D.M.S.'s alleged onset date to December 22, 2011. (*Id.* at 24.) On July 29, 2013, the ALJ issued his decision finding that D.M.S. was not disabled within the meaning of the Act. (*Id.* at 7–23.) On August 12, 2014, the Appeals Council for the Office of Disability and Adjudication ("Appeals Council") denied Plaintiff's request for review of the ALJ's decision, rendering the ALJ's decision the final decision of the Commissioner for purposes of review under 42 U.S.C. § 405(g). (*Id.* at 1–5.) Having exhausted her administrative remedies, Plaintiff filed the instant suit challenging the ALJ's decision on October 15, 2014. (Dkt. No. 1.) Cross-Motions for Summary Judgment were filed, and this matter is ripe for disposition. (Dkt. Nos. 17, 19.)

## II.   <u>FACTUAL BACKGROUND</u>

Claimant D.M.S. was born on May 4, 2004 and was 7 years old at the time of her alleged onset date, December 22, 2011. (R. 13, 37.) D.M.S. lives with her younger sister and her great-aunt, Ms. Williams, who has had legal custody of D.M.S. since June 5, 2008. (*Id.* at 29–30, 134–37.) D.M.S. has two more siblings who live with other family members. (*Id.* at 32.) As a young child, D.M.S. suffered from abuse and neglect by her parents, including an incident when she was nearly drowned by her mother when she was 3 years old. (*Id.* at 30–31, 183, 282.) On the date of the hearing before ALJ Bond, D.M.S. was 9 years old. (*Id.* at 25.)

### A. Medical History

#### 1. Medical Records and Treatment Notes

In early 2011, Dr. Moheb Andrawis, D.M.S.'s pediatrician, referred D.M.S. to Dr. Tauen

Chang for a neurological evaluation. (R. 335.) In February 2011, Dr. Chang examined D.M.S. (*Id.* at 349.) Dr. Chang determined that D.M.S. had been exposed to drugs and alcohol in utero. (*Id.*) He also stated that there were no reported cognitive issues as a result of D.M.S.'s near drowning. (*Id.*) Lastly, Dr. Chang determined that D.M.S. may have attention deficit disorder. (*Id.*) Dr. Chang prescribed a trial course of Focalin at a dose of 5 milligrams per day and recommended an Individualized Education Program ("IEP") assessment. (*Id.*)

In May 2011, D.M.S. saw Dr. Chang again. (*Id.* at 346–47.) Dr. Chang diagnosed D.M.S. with FAS and ADHD. (*Id.* at 346.) Because Ms. Williams and D.M.S.'s teachers reported improvement in attention which waned in the late afternoon, Dr. Chang increased D.M.S.'s Focalin dosage to 7.5 milligrams per day. (*Id.*) In October 2011, D.M.S.'s Focalin dosage was increased again, this time to 10 milligrams per day. (*Id.* at 354.)

D.M.S. visited Dr. Andrawis again in January 2012 for treatment of ADHD and influenza. (*Id.* at 353.) Dr. Andrawis noted that the increased Focalin dosage was helpful and that D.M.S.'s school performance was improving. (*Id.*) Dr. Andrawis also noted that D.M.S. appeared well developed and well nourished but that she was hyper in the exam room, that she could not sit still, and that she "follow[ed] orders with difficulty." (*Id.*) Dr. Andrawis refilled D.M.S.'s Focalin prescription at 10 milligrams per day. (*Id.*)

In June 2012, Dr. Loan Kline saw D.M.S. and reported that she was doing well on the 10 milligram dose of Focalin. (*Id.* at 367.) Ms. Williams reported that D.M.S. was not eligible for an IEP and that she was advancing from the second to third grade but that she had problems completing homework. (*Id.*) Dr. Kline refilled D.M.S.'s Focalin prescription at 10 milligrams a day as a treatment for D.M.S.'s ADHD. (*Id.*) As of February 2013, Dr. Kline had increased D.M.S.'s Focalin dosage to 15 milligrams per day. (*Id.* at 265.)

**2. Psychological Records and Assessments**

In April 2010, D.M.S. began seeing Dr. Debra Nygaard, a psychologist at the Youth and Family Unit of the Alexandria Community Services Board, due to oppositional and aggressive behavior reported by Ms. Williams. (R. 282.) Dr. Nygaard diagnosed D.M.S. with post-traumatic stress disorder ("PTSD"). (*Id.* at 303.) Dr. Nygaard also found that D.M.S. had been abused and neglected before coming into Ms. Williams's care. (*Id.*) Dr. Nygaard attributed D.M.S.'s aggressive and defiant symptoms, including getting into fights, having angry moods, and being violent with others, to her history of abuse and neglect. (*Id.*)  In August 2010, D.M.S. was discharged from the Youth and Family Unit program because she became "more stable behaviorally and emotionally" and because Ms. Williams wanted to focus treatment on D.M.S.'s sister. (*Id.* at 306.)

In November 2011, D.M.S. began seeing Sally Bird, LCSW. (*Id.* at 224, 260.) Ms. Bird treated D.M.S. in individual therapy and as part of family therapy which also included her sister and Ms. Williams. (*Id.* at 260.) D.M.S. began seeing Ms. Bird due to behavior difficulties at home and school and anxiety and depression. (R. 228.) Soon after D.M.S. began seeing Ms. Bird, Ms. Williams reported to Ms. Bird that D.M.S. attempted to hit her sister with a wooden chair. (*Id.* at 240.) Ms. Bird helped Ms. Williams implement a rewards-based behavior modification plan for both D.M.S. and her sister. (*Id.* at 228–40.) In January 2012, Ms. Bird reported that although D.M.S. and her sister still fought, they no longer fought physically. (*Id.* at 232.)

By May 2012, Ms. Bird reported that D.M.S. had no outstanding problems in school. (*Id.* at 260.) However, Ms. Bird reported that D.M.S.'s fighting with her sister persisted and that the girls were, once again, violent with each other. (*Id.*) Ms. Bird reported that, although the

4

behavior modification plan was effective, when the program ended, the girls began to fight again "as forcefully as before." (*Id.*)

In late 2012, D.M.S. stopped seeing Ms. Bird because Ms. Williams was unable to obtain leave from work to take D.M.S. to therapy. (*Id.* At 270.) D.M.S. began seeing Ms. Bird again in February 2013. (*Id.*) In March 2013, Ms. Bird reported that D.M.S. was having trouble in school and fighting with and trying to control her sister and other children. (*Id.*) Ms. Bird reported that D.M.S. was doing well in play therapy and that Ms. Williams agreed to implement another rewards-based behavior modification system. (*Id.*) Ms. Bird reported that D.M.S.'s diagnosis was PTSD. (*Id.*)

### B. School Records

#### 1. First Grade

In March 2011, before D.M.S.'s alleged onset date, Milann Polite, D.M.S.'s first grade teacher, completed a Teacher Questionnaire concerning D.M.S.'s functioning. (*Id.* 199–206.) Ms. Polite reported that D.M.S. was performing at grade level 1.1 in reading, math, and written language and that D.M.S. did not receive any special education services. (*Id.* at 199.) Ms. Polite reported that D.M.S. had problems functioning in the domains of Acquiring and Using Information and Attending and Completing Tasks. (*Id.* at 200–01.)

In the domain of Acquiring and Using Information, Ms. Polite reported that D.M.S. had obvious problems understanding vocabulary, reading and/or comprehending written material, comprehending and doing math problems, expressing ideas in written form, recalling and applying material, and applying problem solving skills in class discussions. (*Id.* at 200.) Ms. Polite reported that D.M.S. had slight problems understanding and participating in class discussions, providing explanations and descriptions, and learning new material. (*Id.*) Ms. Polite

did not report any serious or very serious problems in the domain of Acquiring and Using Information. (*Id.*)

In the domain of Attending and Completing Tasks, Ms. Polite reported that D.M.S. had obvious problems focusing long enough to finish tasks, carrying out multi-step instructions, completing assignments, working without distracting herself or others, and working at a reasonable pace/finishing on time. (*Id.* at 201.) Ms. Polite reported that D.M.S. had slight problems with paying attention when spoken to directly, sustaining attention during play and sports activities, carrying out single-step instructions, waiting to take turns, changing from one activity to another without being disruptive, organizing her own things and school materials, and completing work accurately. (*Id.*) Ms. Polite did not report any serious or very serious problems in the domain of Attending and Completing Tasks. (*Id.*)

Ms. Polite reported that she had not observed problems in the domains of Interacting and Relating with Others, Moving About and Manipulating Objects, or Caring for Himself or Herself. (*Id.* at 202–04.) Ms. Polite also reported that D.M.S.'s medication changed her functioning, making her "able to maintain focus for longer durations." (*Id.* at 205.)

Also in March 2011, PreeAnn Johnson of James K. Polk Elementary School completed a Request for Administrative Information form. (*Id.* at 219–20.) Ms. Johnson stated that although the child study team had decided that D.M.S. had areas of weakness, the team did not suspect that she had a disability that had a significant effect on her education. (*Id.* at 19.) However, because "parent" shared her desire for an assessment, Ms. Johnson reported that the school would complete one by May. (*Id.*) Ms. Johnson also reported that D.M.S. was on level in reading, math, and written language. (*Id.*)

6

### 2. Second Grade

In March 2012, D.M.S.'s second grade general education teacher completed a Teacher Questionnaire. (*Id.* at 246–52.) The Questionnaire states that D.M.S. was on reading level 2.1, math level 2, and written language level 2-beginning. (*Id.* at 246.) D.M.S.'s teacher reported that D.M.S. had problems functioning in the domains of Acquiring and Using Information and Interacting and Relating with Others. (*Id.* at 247, 250.) D.M.S.'s teacher also reported problems in the domain of Attending and Completing Tasks. (*Id.* at 249.)

In the domain of Acquiring and Using Information, D.M.S.'s teacher reported obvious problems in expressing ideas in written form and recalling and applying previously learned material and slight problems in reading and/or comprehending written material, comprehending and doing math problems, learning new material, and applying problem solving skills in class discussions. (*Id.* at 247.) D.M.S.'s teacher did not report any serious or very serious problems in this domain. (*Id.*)

In the domain of Interacting and Relating with Others, D.M.S.'s teacher reported slight problems in seeking attention appropriately and taking turns in conversation. (*Id.* at 250.) D.M.S.'s teacher further reported that it had not been necessary to implement behavior modification strategies for D.M.S. (*Id.*)

In the domain of Attending and Completing Tasks, D.M.S.'s teacher reported that D.M.S. had a serious problem with working without distracting herself or others. (*Id.* at 249.) D.M.S.'s teacher further reported that D.M.S. had obvious problems completing assignments and completing work accurately as well as slight problems focusing long enough to finish a task, carrying out multi-step instructions, waiting to take turns, changing from one activity to another

without being disruptive, organizing her own things or school materials, and working at a reasonable pace/finishing on time. (*Id.*)

### 3. Third Grade

In April 2013, when D.M.S. was in third grade, an initial referral meeting was held to determine whether D.M.S. should be given a 504 Plan. (*Id.* at 271–74.) Under the Plan, D.M.S. would be entitled to small group testing, clarification of directions, a plain English math standard of learning test, extra time on assignments, and preferential seating. (*Id.* at 273.) The referral form states that D.M.S. had attention issues, was slow to start assignments, was unable to stay on task, and practiced avoidance behaviors. (*Id.* at 271.) The meeting participants, including two teachers, Ms. Williams, and a Section 504 Chairperson, determined that D.M.S. had impairments that substantially limited one or more major life activities. (*Id.* at 272.) The impairments were caused by ADHD, FAS, and PTSD and affected D.M.S.'s ability to read, think, concentrate, sleep, work, and learn. (*Id.*) The impairment limited D.M.S.'s life activity because she could not stay on task, had difficulty focusing and was easily distracted, and had difficulty with homework completion. The group determined that D.M.S. was eligible for a 504 Plan. (*Id.*)

In May 2013, another meeting was held to discuss D.M.S.'s performance in reading and writing. (*Id.* at 276.) The meeting minutes state that although D.M.S. had "made great progress" in reading and was compliant and adapted well to routine, she had a difficult time retaining information and was reading at a beginning or mid second grade level.[1] (*Id.*) The school district proposed that it continue to monitor D.M.S. and hold a follow-up meeting in October 2013. (*Id.* at 277–78.) The school decided not to take any other action because there was insufficient

---

[1] The meeting minutes are unclear as to D.M.S.'s reading level, as they state, in different places, that D.M.S. had a beginning second grade and mid second grade reading level. (R. 276.)

evidence to suspect that D.M.S. had a disability that would require special education supports and services. (*Id.* at 278.)

### C. Function Reports

Ms. Williams completed two Function Reports for a Child Age 6 to 12th Birthday in support of D.M.S.'s SSI application. (R. 138–49, 174–84.) In her Report dated February 8, 2012, she wrote that D.M.S., who was 7 years old at the time, could not write in longhand script, make correct change, or tell time but that she was able to read and understand simple words, sentences, and stories, as well as add and subtract numbers over 10. (*Id.* at 142.) Ms. Williams also indicated that D.M.S.'s physical abilities were not limited and that her impairment(s) did not affect her behavior with other people or her ability to take care of personal needs. (*Id.* 143–45.) She reported that D.M.S. could not finish the things she started but could keep busy on her own and complete her homework and chores most of the time. (*Id.* at 146.)

In the Report dated June 19, 2012, when D.M.S. was 8 years old, Ms. Williams stated that she had poor listening skills, handwriting, and pencil control. (*Id.* at 178.) D.M.S. also could not write in longhand script, make correct change, tell time, or write a simple story with 6–7 sentences. (*Id.* at 178.) Ms. Williams reported that D.M.S.'s ability to progress in learning was limited, that she could not keep busy on her own or complete her homework or chores without "very close supervision," and that she was extremely restless, easily distracted, impulsive, and "extremely hyperactive without medication." (*Id.* at 178, 182.) Ms. Williams stated that D.M.S. was usually a happy, friendly child but her impairment(s) affected her behavior with others. (*Id.* at 180, 183.) Specifically, she wrote that D.M.S. could be defiant with adults, had difficulty making friends, was mean to her younger sister, and could become violent "without warning." (*Id.* at 180, 182.)

### D. State Agency Evaluations

On April 30, 2012, State agency medical consultants completed a Disability Determination Explanation form in connection with the initial review of Plaintiff's claim for SSI. (R. 37–45.) The reviewers included Leslie Ellwood, M.D. and Sandra Francis, Psy.D., respectively pediatric and psychological consultants, who concluded that D.M.S. had three severe impairments: ADD/ADHD, affective disorder, and anxiety disorder. (*Id.* at 41.) The consultants found the statements regarding D.M.S.'s symptoms "fully credible," although she was "generally able to do most things that a child her age could do." (*Id.* at 43.) While D.M.S.'s condition resulted in "some limitations in ability to function," the reviewers noted that it was "controlled with medications" and that school records showed "no significant educational impact." (*Id.* at 44.)

In finding that D.M.S.'s symptoms did not meet or equal any of the listings for these impairments, the reviewers observed that she had less than marked limitations in the functional domains Acquiring and Using Information, Attending and Completing Tasks, Interacting and Relating with Others, and Caring for Yourself. (*Id.* at 42.) The consultants noted reports that D.M.S. showed the "stigmata of FAS," and "sometimes ha[d] problems with attention," but no IEP was required and her "reading/math/written levels were on par for her grade level." (*Id.*) The reviewers found no limitation in the last two domains, Moving About and Manipulation of Objects and Health and Physical Well-Being. (*Id.*) D.M.S. was also noted to have a fear of water on her face and a fear of public restrooms, to fight with her sibling and show some oppositional behavior, and to have a heart murmur without significant cardiac-related complications. (*Id.* at 42.)

On July 9, 2012, a second Disability Determination Explanation form was completed

following State agency medical consultants' review of Plaintiff's claim at the reconsideration level. (*Id.* 47–56.) The reviewers included pediatric and psychological consultants, Joseph Familant, M.D. and Nicole Sampson, Ph.D. respectively, who also determined that D.M.S. had three severe impairments— ADD/ADHD, affective disorder, and anxiety disorder. (*Id.* at 52, 54.) These impairments were not found to meet or equal the listings. (*Id.* at 52.) The consultants further concluded that the statements regarding D.M.S.'s symptoms were "partially credible," noting that significant problems with progress in learning and attention were not fully supported by the record. (*Id.* at 54.)

The consultants concluded that D.M.S.'s condition did not cause marked and severe functional limitations. (*Id.* at 55.) They observed that D.M.S. had less than marked limitations in the domains Attending and Completing Tasks, Interacting and Relating with Others, and Caring for Yourself. (*Id.* at 53.) They found no limitations in the domains Acquiring and Using Information, Moving About and Manipulation of Objects, and Health and Physical Well-Being. (*Id.*) The consultants also noted that D.M.S. was responding well to Focalin, a prescription drug used to treat ADHD, that no IEP was required, and that the teacher questionnaire did not report major behavior problems. (*Id.*)

### E. Administrative Hearing Testimony

On July 18, 2013, both Plaintiff and Claimant testified at the hearing before the ALJ. (R. 26–27.) D.M.S. informed the ALJ that she was 9 years old and that she lived with her sister, whom she sometimes got along with, and her great-aunt whom she calls "mom." (*Id.* at 28–29.) She also stated that she was attending a recreation camp during the summer when the hearing took place. (*Id.* at 29.) Following her brief testimony, D.M.S. went outside of the hearing room, and Ms. Williams testified. (*Id.* at 29–30.) Ms. Williams stated that she was granted full custody

of D.M.S. when she was 3 years old, due to her parents' substance abuse and child abuse. (*Id.* at 30.) Ms. Williams explained that the Claimant's mother went to jail after D.M.S. nearly drowned in a wading pool. (*Id.* at 31.) The ALJ also clarified for the record that D.M.S. was born with FAS. (*Id.*)

Additionally, Ms. Williams stated that D.M.S. could be violent at home and had once almost hit her sister in the head with a wooden chair. (*Id.* at 33.) She stated, however, that D.M.S. was "fairly well behaved in school" but was having trouble academically. (*Id.* at 32–34.) Ms. Williams testified that she was concerned that D.M.S. was not functioning very well in a general education classroom, that she had difficulty retaining information, and that she would be repeating the third grade in the upcoming school year after failing her standardized tests and what Ms. Williams estimated to be 90% of her classroom academic tests. (*Id.* at 32–33.) Ms. Williams testified that D.M.S. had a 504 Plan that allowed her priority seating, repeated instructions, extra time to take tests, and a small group setting "for next year." (*Id.* at 33.) She also testified that D.M.S. was prescribed medication for ADHD and was seeing a mental health professional. (*Id.*) Ms. Williams explained that she believed D.M.S. belonged in special education and had scheduled a meeting at the beginning of the coming school year. (*Id.* at 33–34.)

### III.   STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, this Court is limited to determining whether that decision was supported by substantial evidence in the record, and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v.*

*Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is more than a mere scintilla, but less than a preponderance. *Id.* (citing *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). If the ALJ's determination is not supported by substantial evidence in the record, or if the ALJ has made a reversible error of law, the district court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). In reviewing the record for substantial evidence, the court should not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). The Commissioner's findings of fact, if supported by substantial evidence, are conclusive and must be affirmed. *Perales*, 402 U.S. at 390.

This Circuit applies a harmless error analysis in the context of social security disability determinations. *See Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015); *Hammond v. Colvin*, No. 1:12-cv-01177, 2013 WL 5972432, at *6 (E.D. Va. Nov. 8, 2013). Courts will disregard any errors that "do not affect any party's substantial rights." Fed. R. Civ. P. 61 (harmless error); *see also Morris v. Bowen*, 864 F.2d 333, 335–36 (5th Cir. 1988). Furthermore, in reviewing an ALJ's decision, the court does not search for procedural perfection. *Morris*, 864 F.2d at 335; *see also Hubbard v. Astrue*, No. 3:10cv1132, 2011 WL 3629198, at *13 n.8 (S.D.W. Va. July 29, 2011) (noting the Fourth Circuit has taken this approach in several unpublished decisions). With this standard in mind, the Court evaluates the ALJ's findings and decision.

## IV.   ANALYSIS

### A. Determining Disability and the Sequential Analysis

A claimant under the age of 18 is considered disabled if she "suffers from a medically determinable physical or mental impairment, which results in marked and severe functional

limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(C)(i). The ALJ is required to employ a three-step sequential evaluation to determine the claimant's eligibility for SSI benefits. 20 C.F.R. § 416.924. Specifically, the ALJ must first consider whether the claimant (1) has engaged in "substantial gainful activity" ("SGA").[2] 20 C.F.R. § 416.924(a). If the claimant has not engaged in SGA, the ALJ determines whether the claimant: (2) has a severe impairment or combination of impairments that is severe or (3) has a severe impairment or combination of impairments that meets, medically equals, or functionally equals a condition contained within the SSA's official Listing of Impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. 20 C.F.R. § 416.924(c), (d).

An impairment or combination of impairments *meets* a listing when all of the criteria and the durational requirement of the specific listing are satisfied. 20 C.F.R. §§ 416.925(c)(3). An impairment or combination of impairments *medically equals* a listing when it is at least equal in severity and duration to the criteria of any listed impairment (e.g., the child exhibits all but one of the findings specified in a particular listing, but other related findings are at least of equal medical significance to the required criteria). 20 C.F.R. § 416.926(a), (b). An impairment or combination of impairments functionally equals a listing when it results in "'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a).

---

[2] SGA is work that is both substantial and gainful as defined by the Agency in the Code of Federal Regulations. Substantial work activity "involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks, hobbies, therapy, school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

In assessing the functional limitations caused by the impairments, the ALJ examines the child-claimant's limitations in six areas of development and functioning in order to determine whether she has "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The six relevant domains of functioning are as follows: (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3) Interacting and Relating with Others; (4) Moving About and Manipulating Objects; (5) Caring for Yourself; and (6) Health and Physical Well-Being. 20 C.F.R. § 416. 926a(b)(1).

## B. ALJ's Findings of Fact and Conclusions of Law

In accordance with the three-step sequential analysis, the ALJ made the following findings of fact and conclusions of law. The ALJ established that D.M.S. was a preschooler on December 22, 2011, the date the application was filed;[3] that she was a school-age child at the time of hearing; and that she had not engaged in SGA since her alleged onset date. (R. 13.) Next, the ALJ concluded that D.M.S. suffered from the severe impairment ADHD. (*Id.*) In evaluating the effect the impairment has on D.M.S.'s functioning, the ALJ stated that "the indicated impairment has caused more than minimal limitation in the claimant's functioning." (*Id.*) The ALJ did not find, however, that the impairment met or medically equaled the severity of Listing 112.11, Attention Deficit Hyperactivity Disorder.[4] (*Id.*)

The ALJ then determined that D.M.S. did not have an impairment or combination of impairments that functionally equaled the severity of the listings. (*Id.*) Specifically, the ALJ

---

[3] Because D.M.S. amended her onset date to December 22, 2011 on the date of the hearing, (R. 24), D.M.S. was a school-age child on her alleged onset date. Although the ALJ misstated D.M.S.'s age group as of the onset date, the ALJ applied the correct, age appropriate standard when evaluating D.M.S.'s claim.

[4] The criteria for the Listing are: "Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity. The required level of severity for these disorders is met when the requirements in both A and B are satisfied. A. Medically documented findings of all three of the following: 1. Marked inattention; 2. Marked impulsiveness; and 3. Marked hyperactivity; and B. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02. 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.11.

assessed the degree of D.M.S.'s limitations in each of the six domains of function and found less than marked limitations in all domains except Moving About and Manipulating Objects and Health and Physical Well-Being, for which the ALJ found no limitations. (*Id.* 18–23.) Therefore, the ALJ determined that D.M.S. was not under a disability at any time since December 22, 2011. (*Id.* at 23.)

## C. Cross-Motions for Summary Judgment

The Plaintiff raises two primary issues in this action: (1) whether the ALJ erred by failing to consider all of D.M.S.'s severe impairments when evaluating functional equivalence to a listed impairment and (2) whether the ALJ improperly evaluated D.M.S.'s functioning in the domains of Attending and Completing Tasks and Acquiring and Using Information. Defendant seeks summary judgment on the ground that the ALJ's decision is supported by substantial evidence and, therefore, should be affirmed. Defendant's briefing focuses on disputing the arguments propounded by Plaintiff. Therefore, the Court will address each of Plaintiff's objections to the ALJ's decision in turn.

### 1. Evaluation of Error 1

The ALJ found that ADHD was D.M.S.'s only severe impairment. (R. 13.) However, the State agency physicians diagnosed D.M.S. with severe affective and anxiety disorders as well. (*Id.* at 41.) Plaintiff argues that the ALJ erred because he failed to explain why he did not find Plaintiff's affective and anxiety disorders to be severe impairments. (Pl.'s Br. 5.) For the reasons stated below, the undersigned recommends a finding that any error in the ALJ's failure to include D.M.S.'s affective and anxiety disorders as severe impairments was harmless error.

### i. Applicable Law

An ALJ is required to analyze all relevant evidence and sufficiently explain his findings.

*Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997). "Unless [an ALJ] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits," a reviewing court cannot find that the ALJ's decision is supported by substantial evidence. *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977). ALJs "are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions." SSR 96-6p, 1996 WL 374180, at *2 (S.S.A.). As discussed above, reviews of ALJ decisions are conducted under the harmless error analysis. An ALJ's failure to find an impairment severe at the second step "is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process." *Cook ex rel. A.C. v. Colvin*, No. 2:11-cv-362, 2013 WL 1288156, at *4 (E.D. Va. Mar. 1, 2013.)

### ii. Analysis

If the ALJ erred by failing to explain why he did not find Plaintiff's anxiety and affective disorders to be severe impairments, the error was harmless. The ALJ found that D.M.S. suffered from another severe impairment: ADHD. (*Id.* at 13.) The ALJ then continued in the evaluation process and considered all aspects of D.M.S.'s reported behavior when determining whether D.M.S.'s impairments functionally equaled the listings. In his evaluation, the ALJ stated that he considered D.M.S.'s complete medical history, including all medically determinable impairments, not only severe impairments. (R. 10, 11.) While the ALJ's opinion differed from that of the State agency physicians in regard to severe impairments, the ALJ agreed with the State agency physicians' first assessments of D.M.S.'s level of limitation in each of the domains. (*Id.* at 17–23, 42.) The ALJ found D.M.S. to be more limited than the State agency physicians

did in their second assessment.[5] (*Id.* at 53.)

As Ms. Williams's attorney suggested, most of D.M.S.'s issues stem from ADHD. (*See id.* at 27.) The only limitation that the State agency physicians did not attribute to Plaintiff's ADHD was the limitation in Caring for Yourself, in which the physicians noted that Plaintiff had a fear of public restrooms and water on her face, was impulsive, and had angry outbursts at home. (*Id.* at 42.) The State agency physicians found that D.M.S. had a less than marked limitation in the domain of Caring for Yourself and did not attribute that limitation to a specific impairment. (*Id.*)

Although the ALJ found that ADHD was D.M.S.'s only severe impairment, the ALJ also found that D.M.S. had a less than marked limitation in the domain of Caring for Yourself. (*Id.* at 22.) The ALJ noted that D.M.S. had a "deficit in controlling her temper at home, especially with her sister; however, this was not reported as a significant problem in any objective records." (*Id.*) Because the ALJ continued in the evaluation process and considered the effects of D.M.S.'s other impairments in the following steps of the evaluation, any error in not explaining why his findings of severe impairment differed from those of the State agency physicians was harmless.

### 2. Evaluation of Error 2

The ALJ found that D.M.S. had less than marked limitations in the domains of Attending and Completing Tasks and Acquiring and Using Information. Plaintiff argues that the ALJ's finding was not supported by substantial evidence because the ALJ failed to evaluate evidence contrary to his opinion regarding D.M.S.'s functioning and incorrectly relied on his speculation that a medication adjustment might improve D.M.S.'s functioning in those domains. (Pl.'s Br. 6–

---

[5] The State agency physicians who performed D.M.S.'s second assessment found no limitation in the domain of Acquiring and Using Information. (R. 53.) The ALJ found that D.M.S. had a less than marked limitation in that domain, "as the record [documented] some significant delays in terms of the claimant's reading and writing ability." (*Id.* at 17.)

8.) For the reasons stated below, the undersigned recommends a finding that the ALJ did not err in determining that D.M.S. had less than marked limitations in the domains of Attending and Completing Tasks and Acquiring and Using Information.

### i. Applicable Law

As discussed above, this Court must determine whether the ALJ's decision was supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). An ALJ is required to explain his findings so that a reviewing court is able to determine whether his decisions are based on substantial evidence. *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977). However, it is important to note that "an ALJ is not required to discuss each piece of evidence" included in the record. *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998). Furthermore, an ALJ's "failure to cite specific evidence does not establish that the ALJ failed to consider it." *Phillips v. Barnhart*, 91 Fed. App'x 775, 780 n.7 (3rd Cir. 2004); *see also Gullace v. Astrue*, No. 1:11cv0755, 2012 WL 691554, at *24 (E.D. Va. Feb. 13, 2012) (citing both *Black* and *Phillips*).

When reviewing a claim filed on behalf of a child, the ALJ must apply the correct, age-appropriate standard. Pursuant to the Social Security Regulations ("SSR"), a child from age six to the attainment of age 12 is defined as a "school-age child." *Id.* § 416.926a(g)(2)(iv). When determining whether a child's impairments functionally equal a listing, the ALJ must use the age-appropriate standard to determine the child's level of functioning in each domain of functioning. *Id.* § 416.926a(f)(1). A child has a marked limitation in a domain when the child's impairments interfere seriously with his or her "ability to independently initiate, sustain or complete activities." *Id.* § 416.926a(e)(2).

### 1. Acquiring and Using Information Domain

In the domain of Acquiring and Using Information, school-age children should be able to learn to read, write, do math, and discuss history and science. *Id.* § 416.926a(g)(2)(iv). School-age children should be able to read about various subjects, produce oral and written projects, solve math problems, take achievement tests, do group work, and take part in class discussions. *Id.* School-age children should also be able to use increasingly complex vocabulary and grammar to share information and ideas by asking questions, expressing their ideas, and understanding and responding to others' opinions. *Id.*

### 2. Attending and Completing Tasks Domain

In the domain of Attending and Completing Tasks, school-age children should be able to focus attention to follow directions, remember and organize school materials, and complete homework assignments. *Id.* § 416.926a(h)(2)(iv). School-age children should be able to concentrate on details and not make careless mistakes that children of the same age without impairments would not be expected to make. *Id.* They should be able to change activities without becoming distracted or distracting others and complete transition tasks, such as being ready for the school bus or changing classrooms, without extra reminders and accommodation. *Id.* School-age children should also be able to sustain attention well enough to participate in group sports, read, and complete chores. *Id.*

### ii. Analysis

Plaintiff argues that the ALJ's evaluation in the domain of Acquiring and Using Information was erroneous because the ALJ failed to consider that "D.M.S. had made little if any progress in over a year" as of May 2013 and because the ALJ speculated that D.M.S.'s condition might improve with a medication adjustment. (Pl.'s Br. 7.) Plaintiff argues that the ALJ failed to

20

note that the March 2012 Teacher Questionnaire and the May 2013 meeting minutes, taken together, show that D.M.S. made no progress in reading and written language over the course of a year. (*Id.*)

Plaintiff's argument is without merit. First, the ALJ is not required to cite to each piece of evidence that is contained in the record. Second, in this case, although not required to, the ALJ referenced both the March 2012 Teacher Questionnaire, acknowledging that D.M.S.'s "second grade teacher indicated that she was performing at grade level in all subject areas," and the May 2013 meeting minutes, acknowledging that D.M.S.'s reading and writing "were at a beginning second grade level." (R. 16.) However, as the ALJ correctly notes, the meeting minutes also state that D.M.S. "made great progress." (*Id.*; *id.* at 276.) Furthermore, the March 2012 Teacher Questionnaire, which is the most recent in the record, does not report any serious problems in the domain of Acquiring and Using Information. (*Id.* at 247.) Because the record indicates that, as of 2012, D.M.S. had no serious problems in the Domain of Acquiring and Using Information and, as of 2013, D.M.S. had made progress in reading and writing, the ALJ's determination is supported by substantial evidence in the record.

Next, Plaintiff argues that the ALJ erred when analyzing D.M.S.'s functioning in the domain of Attending and Completing Tasks. (Pl.'s Br. 5.) D.M.S.'s treating physician noted that during a January 2012 visit, D.M.S. was hyper and unable to sit still in the exam room and that she followed orders with difficulty. (*Id.*; R. 353.) Plaintiff argues that the ALJ's failure to address D.M.S.'s treating physician's note was error because that evidence contradicted the ALJ's determination. (Pl.'s Br. 5.) Plaintiff also argues that, as with the domain of Acquiring and Using Information, the ALJ erred when he speculated that D.M.S.'s condition might improve with a medication adjustment. (*Id.* at 6.)

The ALJ did not mention the doctor's note in his opinion. However, as explained above, that does not mean he did not consider it. The ALJ stated that he considered D.M.S.'s complete medical history. (R. 10.) Furthermore, substantial evidence in the record supports the ALJ's determination that D.M.S. had a less than marked limitation in the domain of Attending and Completing Tasks. As noted several times in the record, D.M.S.'s medication markedly increases D.M.S.'s ability to concentrate. (*See, e.g., id.* at 53, 205, 346, 353.) Although D.M.S.'s second grade teacher reported that D.M.S. had a serious problem working without distracting herself or others and obvious problems completing assignments and completing work without careless mistakes, D.M.S.'s teacher reported no problem or only a slight problem in the ten other activities listed on the Teacher Questionnaire in the domain of Attending and Completing Tasks. (*Id.* at 249.)

Plaintiff relies on *See v. Washington Metropolitan Area Transit Authority*, 36 F.3d 375 (4th Cir. 1994) to support the argument that the ALJ erred by failing to mention and explain why he rejected evidence contrary to his opinion. Plaintiff's reliance on *See* is misplaced. In *See*, the Fourth Circuit Court of Appeals reversed and remanded an ALJ's decision on remand because "the ALJ erroneously revisited medical evidence and, without justification or explanation, abandoned his prior findings" as to disability. *See*, 36 F.3d at 384. The Court of Appeals found the lack of explanation problematic because the case was remanded only for the purpose of determining whether suitable alternative employment existed. *Id.* at 384–85. This case did not come before the ALJ on remand, and the there is no indication that the ALJ rejected any evidence. Rather, as explained above, the ALJ indicated that he considered the whole record, and substantial evidence exists to support the ALJ's determinations.

Lastly, Plaintiff's argument regarding the possibility of a medication adjustment is

without merit. Plaintiff argues that the ALJ's decision is not based on substantial evidence because the ALJ speculated that a medication adjustment could improve D.M.S.'s functioning. (Pl.'s Br. 6–7.) As discussed above, the ALJ's determinations in the domains of Acquiring and Using Information and Attending and Completing Tasks are supported by substantial evidence in the record. The evidence in the record, and as recited in the ALJ's opinion, is evidence of D.M.S.'s functioning at her current and past medication levels. The evidence does not contain speculation concerning how D.M.S. might function if she received a medication adjustment. Notwithstanding the ALJ's assertion, there is substantial evidence in the record that D.M.S.'s impairments did not functionally equal the listings.

This Court's role is not to weigh the conflicting evidence or substitute its judgment for that of the ALJ. Based on a thorough review of the record and the ALJ's decision, the undersigned finds that any error in the ALJ's failure to include D.M.S.'s affective and anxiety disorders as severe impairments was harmless error. Additionally, the undersigned finds that the ALJ did not err in failing to mention certain contradictory evidence in his opinion or in speculating that a medication adjustment could improve D.M.S.'s ability to focus. The undersigned finds that the ALJ applied the correct legal standards when evaluating the evidence and that the ALJ's decision is supported by substantial evidence in the record. Thus, the undersigned recommends that summary judgment be granted in favor of Defendant.

## V.  RECOMMENDATION

**For the reasons set forth above, the undersigned Magistrate Judge finds that the ALJ's decision is supported by substantial evidence and does not contain legal error. Additionally, there is no evidence warranting remand. Accordingly, the undersigned recommends that Defendant's Motion for Summary Judgment (Dkt. No. 19) be**

GRANTED, and Plaintiff's Motion for Summary Judgment or, in the alternative, for remand (Dkt. No. 17) be DENIED.

### VI.    NOTICE

By mailing copies of this Report and Recommendation, the parties are notified that objections to this Report and Recommendation, pursuant to 28 U.S.C. § 636 and Rule 72(b) of the Federal Rules of Civil Procedure, must be filed within fourteen (14) days of service on you of this Report and Recommendation. A failure to file timely objections to this Report and Recommendation waives appellate review of the substance of the Report and Recommendation and waives appellate review of a judgment based on this Report and Recommendation.

The Clerk is directed to send a copy of this Report and Recommendation to all counsel of record.

_____ /s/
Ivan D. Davis
United States Magistrate Judge

March 2, 2016
Alexandria, Virginia